Appeal 1258 Vanderbilt University v. ICOS Corp. Mr. Brennan, good morning to you. Welcome to the Court. Please proceed. Good morning, Your Honor. May it please the Court, at paragraph 86 of the District Court's opinion, the District Court stated that because there is no evidence that Corbin, Francis, and Congetti ever conceived of, quote, the specific chemical structure of the claimed compound, end quote, citing to this Court's opinion in Burroughs-Wellcome, or, quote, the compound with all of its components, citing to this Court's decision in American Bioscience, or communicated that compound to Glaxo, plaintiff has failed to demonstrate Is an inapt phraseology in a District Court opinion in one sentence out of a very lengthy opinion per se reversible error? No, Your Honor, clearly not. But I believe that this paragraph, among others, but this among other things, the fact that the two portions of those two opinions that the Court's citing to in that paragraph go to the issue of, and the discussion in those respective opinions, of what it is to conceive, the definition of conception of a chemical compound, not the standard for joint inventorship. Why isn't the law we have to follow here, the American Bioscience case, which essentially says if, to be a co-inventor, if you invented one part of the total molecule, you have to have an understanding of how that fits into all the other parts, even if they were invented by somebody else. What's complicated about that? Well, Your Honor, I believe that that's inconsistent with the Congress's intent in 116, which sets no express lower limit and no on the quantum of contribution. And there's nothing in the law that contributes one novel idea to another invention. You may have that argument, but I would suggest to you that this panel is bound by the prior decision in American Bioscience. So either you can distinguish that, or you probably should assume we're going to follow it. Well, Your Honor, the American Bioscience case did not apply the rule that is espoused by ICOS in this case. I don't care what they're espousing. I think the three of us are bound by our oath of office and by the precedent of the court to follow a prior panel ruling's holding. It looks to me like American Bioscience holds that he who wants to be a co-inventor and invented a part of a complex molecule has to have an understanding of how the part he conceived of fits with all the other parts. Period. End of story. Well, Your Honor, in the American Biosciences case, the court, when it found that what happened in the American Biosciences case can't be divorced from the language of the opinion, the district court in that case got the American Biosciences scientists off the patent as inventors and said that the Florida State scientists are the sole inventive entity. Let me ask you a simple question. Is Florida Bioscience a joint inventor case? The answer is no. It was two competing groups. It was the Florida Science Group and it was the group that the district court looked at. And it was a question of whether or not the Florida Science Group as a whole, all of them together, conceived of the invention. That's correct. And the court said, well, if all you conceived of was a piece of the invention, you didn't conceive the whole invention. You lose. That's what that language said at the end of the opinion. It's not a joint inventor case. Correct, Your Honor. It certainly was with respect to that. But they did, the court did examine the issue of whether Dr. Holton was a co-inventor and important to the questions. And they had Juanita's crossover, Tal, who worked for both teams. But they weren't talking about the relative contribution in the FSU group between one and the other or the other. That's what we've got here. We've got a relative contribution by two players. Correct. So I would think you would argue that Florida Science is holding as limited as the facts of the case. It's two competing groups to see who was the whole inventor. That's exactly how we view it. Even if the district court made errors in law, sir, why doesn't paragraph 91 cook your goose? Paragraph 91 says, if I've got it correctly, it's a toss-up. Glaxo has one story about how it made the invention independently. There's testimony from the Glaxo key inventor that Vanderbilt, Schmanderbilt, he never heard of. That's the Glaxo story. It's impaired a bit by their reliance on an article that got published after they made their conception, but they've gotten rid of that. Your story is that you've got to believe that your contribution was used because it was found themselves when they were searching. The district court said it's a toss-up, equally plausible. And if it's equally plausible, how can you make the test? Well, your honor, there's... Very convincing evidence. If the tests were lower, you might have a shot. Well, your honor, as the district court acknowledged earlier on in its opinion, there were two theories through which Vanderbilt has asserted that its scientists contributed to the conception of the claimed compounds. One was that their compound that they communicated was used to lead to the lead compound, the GR 30040X compound. The second assertion, which was never addressed by the district court because the district court drew a bright line, basically, with the joint inventorship standard that she adopted, that if you either conceive of the entire compound or you're prosaic, was basically where she went with that, she never addressed... That's not what she said. You don't have to design all 16 parts of the molecule to be a co-inventor. What she said is, if you design one part, you have to know how that one part fits into the other 15. You're just misquoting what she said. Well, your honor, if we look to the evidence on the development of the lead compound, once it was identified, setting aside the toss-up that's identified, and I think, as we've said in our briefs, there was evidence that was not considered by the court that... You have to break through finding a FAC 91 and say it's clearly a ruminant, don't you? If I'm going to get a reversal on the basis of the identification of the lead compound... Right there it says, well, there are two stories about what happened here. Two stories with respect to whether GR 30,040X was found through a substructure search of our compound or through this other compound. That's the only part she's addressing. You had two theories and that she's only dealing with one of them that has to do with the substrate search, right? What was the other theory? The second theory goes to the modifications that took place to that lead compound after it was identified prior to Dr. Dogan joining the program. Is there any evidence that Vanderbilt contributed anything after the substrate search found the thing that the other French doctor put the bells and whistles on? I'd like to review that for your honor right now. On direct, Dr. Dogan was asked who conducted the structure activity relationship analysis of the lead compound. He said that he did, and then he went on to testify as to what he did in that SAR study. That testimony is in our appendix, volume one, at pages 693 to 702. He described a process of complete trial and error in which first they experimented with swapping out the puridine ring on GR 30,040X and tried a variety of different aromatic moieties at that point in the compound and tested them and determined that the best substitute at that point was the phenyl ring. Coincidentally, the exact structure that the Vanderbilt scientists attached to their compound. He then goes on to say, next, after having identified this compound with the phenyl ring, which they registered as GF 173770, in which he testified in that testimony, was synthesized on October 5, 1992, they then went on to test a variety of substituents at different locations on the phenyl ring. So what's the evidence that they used the phenyl ring? I'm getting there, your honor. And then they, lo and behold, they discover that the most effective, in terms of increasing potency with PDE 5, was attaching an electron donating substituent to the 4 position on the phenyl ring, precisely what the Vanderbilt people did. So where is the evidence that Vanderbilt information got to the French inventors? The problem with that whole line of testimony and description of the SAR is that it couldn't have happened that way, because as he also testifies, the second compound in the supposed sequence, the GF 173221X, which has simultaneously the phenyl ring substituted and an electron donating substituent at the 4 position, was synthesized on September 23, 1992. Weeks before the first step that he testified, where they were supposedly randomly testing all these different aromatic rings. What does that prove? It proves... They might have the sequence backwards? No, it proves that the first thing that was done in the SAR study of this lead compound was to change it so that its structure at that point was exactly as the Vanderbilt one. Change the pyridine to a phenyl... The only possible reason that it could have been done was because they had the Vanderbilt information in front of them, and Dr. L, I can't pronounce his name... LeBaldenier... ...an abject liar when he testified Vanderbilt-Schmanderbilt. He's an abject liar, correct? Your Honor, they certainly didn't get that... What else is a good doctor unless he's an abject liar? Well, Judge... He was challenged as such at trial, believe, right? He did not appear live to testify, so we weren't able to challenge him in court on that. So what? Then what he said stands, right? Unless it's undermined by the rest of the facts and the evidence. So, so. I mean, we're stuck with the record, aren't we? You are, but the record I'm fine with. And the other thing that I need to point out... Let me see if I can understand this. What you're saying in response to Judge Clevenger's questions is that she says, I'm considering the, your story, that this was used for the sub straight search. And I find it's equally balanced as to that. What you're saying, if I understand it correctly, is that there's another theory that after the identification of the lead compound, the Vanderbilt contribution was used to modify that to achieve the patented compound, correct? Correct. And that's demonstrated by the fact that the first thing they do to it is to make those changes. So you're saying we have some evidence that there may be evidence the other way, but that we don't have a finding of fact from the district court resolving that particular... Correct. She never reached that because just modifying that one part of the compound, if your, your standard is the entire compound, and I recognize that I've... Your theory would be you're a joint inventor, even though the substrate, Vanderbilt substrate, was not used by Glaxo. Well, I... I don't want to be very clear because, because this fact finding, if it's limited to the substrate, then you have to say that there's clearly erroneous, otherwise it stands. If your exit strategy is to say, okay, I'm bound by that fact finding, it's a toss up as to whether or not our substrate went in. But once they got their substrate, they couldn't have gotten to the final invention without us. Your Honor, I'm not abandoning the fact that I think it was clear error with respect to the substructure search testimony. The district court expressly failed to consider... Can you show us in the record where your second theory, this theory that you presented evidence showing that Dr. L's instruction to the other doctor couldn't have gotten to the invention without the benefit of your bells and whistles add on? The evidence is in the compounds themselves, but it's also in the 1993 annual report that they rely on as their evidence of how the substructure search took place that the change to add the phenyl ring and the electron donating substituent dramatically increased the potency with respect to inhibiting PDE5. You're drawing an inference from what they did, but they must have done it using the Vanderbilt compound. Well, only from the fact that it was the first thing they did, and that shortly after they did it with that compound, they attached the exact same structure, phenyl ring and electron donating substituent to a Zafranast compound that was being worked on by another chemist who was under Dr. LeBaudinier's direction. Did they present contrary testimony? As to why they suddenly didn't know. There was no testimony as to what the basis was. The only test with respect to the Zafranast compound, the only testimony with respect to... The second French doctor was basically a set of hands in the laboratory who was doing what a lot of ordinary skill in the art would do, considering what they were looking for. I'm sorry, I didn't get the... I got the impression, perhaps, and I'm dead wrong, that the whole case here turned on the substrate and who contributed to the substrate, and that there wasn't really a genuine fight as to what happened after the substrate was identified. There's a genuine fight about that, and there always has been. With respect to the substrate, as I say, she expressly decided not to consider the English translation of the October 92 minutes, in which there's clearly a debate going on at that point whether the other compound was a carboline or a Zafranast derivative, which had been considered to be throughout its history up to that point. Also there was... Even if your substrate would be viewed to be a substantial contribution or significant contribution, it's got to get to the joint inventor to be used in order for you to win. Absolutely does. I think that the court, in its overall finding, that it is untenable to conclude on the basis of the overall record. What you basically have to do is to destroy the true inventor's testimony, right?  That he didn't know about Van der Brugge. Well, no, I don't need to do that, because as I point out in my brief, there was plenty of examples of Glaxo using Vanderbilt's technology and having its scientists use Vanderbilt technology without informing them. Your information could have been transferred to Glaxo for sure. Glaxo could have a letter back saying, thank you for sending us your substrate, signed General Counsel, whatever. If it didn't get into the hands of the inventor, the primary inventor here, it doesn't do you any good. Glaxo's not an inventor. But Dr. LeBaudnier, we were able to document, it's in the record, that Dr. Ross, who after... Yeah, yeah, he had it, but the testimony was that Dowgan, who was the named inventor here, didn't have it. Yeah, but... And isn't Judge Clevenger right that you have to disbelieve Dowgan's testimony, that he didn't use the Vanderbilt stuff, and didn't even know about it, in order to prevail on the second theory? You have to disbelieve Dowgan's testimony that his arrival at a phenyl substitution with an electron donating substituent was the result of his random testing a whole variety of aromatic rings first. For you to win, you have to disbelieve him. You have to disbelieve that, and then you have to draw an inference.  Because, as I just pointed out, if you read that testimony that I gave you the citation to, he testifies that I developed this compound further by first testing all sorts of aromatic rings. And when I found one that worked, then I did the next step, which was I tested all sorts of substituents, and lo and behold, through my random testing, which by definition could have nothing to do with the Vanderbilt, that I arrived at, coincidentally, the exact same structure that you have. How does the random testing occur? Is that a matter of punching buttons on a computer? Pardon me? How does the random testing occur? There's no random testing. No, the testing that the inventor said he did, the named inventor. Did he work a computer and just push some buttons? No, the chemist, as he testified, the chemist synthesizes the compound, registers it, which is another reason why you can see that the 1GF13221X was the first compound developed in the SAR with the phenyl ring and the electron donating substituent, because it's the first number that are sequential numbers. He registers it, so it gets that number assigned, and then he turns it over to a biologist who tests it, gives him the results. It sounds to me like you're asking this court to make credibility findings and to draw inferences contrary to what the actual fact finder did. That's a very unusual request. I don't think so, Your Honor, because as I pointed out, first of all, the district court never made a factual finding with respect to whether or not those modifications were the result of Vanderbilt's contributions. That finding has never been made. At least it's not in the opinion. I guess I'm attacking Dr. Belgan's credibility, but the documents that he referred to say what they say. Your theory essentially is that it would be impossible to accept the testimony of the Named Inventor, because the documents conclusively prove that everything he said is false. No, Your Honor, I'm not saying that. I'm saying that the documents, contrary to the Named Inventor's testimony, show that the very first thing he did was make changes that were completely consistent with Vanderbilt's research proposal taught. When you put that together with the fact that they then tried the exact same structure on another PD-5 inhibitor that they were putting together. You're saying that there's a necessary inference, that any fact finder would have to agree with you and that no rational fact finder could possibly fail to draw the inference you draw. No, Your Honor, I don't think that's what I'm saying either. I'm saying if the district court, viewing the facts through the proper legal standard for joint inventorship, looks at this evidence, it will reach a finding based upon even a clear and convincing standard. You're saying that she could have made such a finding, but she hasn't addressed the question. You're not saying she was compelled to make a finding. She could, after all, have believed Dr. Dowery. You're saying she could have disbelieved him too, right? And we don't know. All we know is that she says it's untenable that we didn't make some contribution. She doesn't say what that is, but she says it's prosaic. And I believe that that's fairly clear from the record of her opinion that that's because of the standard for joint inventorship that she applied. We've given you a lot of extra time. We'll have to hear now from Mr. Flowers and we'll restore some rebuttal time. May it please the Court, thank you and good morning, Your Honors. Kevin Flowers for Icos Corporation. I'm here with my colleague, Matt Nielsen. I think your questions were, as usual, right on point. They did. We don't need compliments. We need you to respond to what Mr. Brennan has said, or if you don't think it requires a response, then don't make a response. Very good, Your Honor. In fact, Judge Robinson did address this issue of the second theory at the very point where Mr. Brennan took you to, which is A42 in the record, paragraph 86, footnote 50. She says, Plaintiff seeks an inference that LeBaudinaire communicated the Vanderbilt structural features to Dogan and directed Dogan to incorporate them into his research. And she says, Notwithstanding the lack of evidence in this regard. She found there was no evidence to support that theory. Just like the first theory, she found there was no evidence. They're not saying that the claim, as they've articulated today, doesn't have anything to do with directing Dogan to incorporate the Vanderbilt stuff into his research. Well, there's no other way that Dr. Dogan could have known about this. There's no evidence. He could have known about it and made his own decision to incorporate it. This is not a clear finding contrary to the theory they've been espousing today. I'm having trouble with that. Well, just as she found that there was no evidence to support the first theory about the identification of the lead compound. She says, Here, there's no evidence to support this theory, but that information from Vanderbilt was used by Dr. Dogan. That's what she's saying. No, but that's not what she says. She says, Plaintiff seeks an inference that LeBaudinaire communicated the thing to Dogan and directed Dogan to incorporate them. I didn't hear them this morning saying that they were resting on any theory that LeBaudinaire directed Dogan to incorporate them. Sorry. They're saying that he did incorporate them. He could have done it on his own. He could have done it because somebody else told him to. But this is not a complete finding with respect to their second theory here. There's no evidence, and Mr. Brennan can't point you to any evidence, that Dogan knew about the Vanderbilt information. There is none. Well, aside from the inference that they say you should draw from the fact that the ultimate structure of the patented compound has this contribution from Vanderbilt. They're asking that an inference be drawn to that, and what they're saying is that the district court didn't tell us whether she was willing to draw such an inference or not. It hasn't made any finding about that issue. And that if the legal standard was wrong, then we should send it back to her to consider whether she wants to make this finding or doesn't want to make this finding. That's the theory. There was no evidence and no argument below by Vanderbilt that there was any other communication of the Vanderbilt information to Dr. Dogan. There's simply no evidence and no argument below. Now, it's a situation something like Kimberly-Clark versus Proctor and Gamble where you have two people who may have looked at a problem, and the first one comes up with what they think is the solution. The second one, in a completely different way, comes up with something that someone can argue later, resembles the first. That doesn't make them co-inventors. There's no evidence of communication. There's no collaboration there. Right, but on this particular point, aren't we trying to decide whether footnote 50 on page 840 of the opinion represents a fact finding on what Vanderbilt's calling a second theory? That's correct, Your Honor. And Judge Dike has said, well, he's concerned because here it seeks an inference that not only was the information communicated, but there was a direction and directed. Well, if there's no evidence that it was communicated, isn't that enough from your side? That's correct, Your Honor. I mean, the fact that there was some confusion here about there also wasn't any pure direction to incorporate it, if there's no invention that there was any communication. That's correct. Then there's a fact finding that the Vanderbilt information never got to the inventor. That's correct, Your Honor. And that then supports the fact finding that I pointed out in the beginning that says it's a draw, although do you agree that fact finding 91 is limited to the substrate issue? To the identification of the lead compound issue, yes, Your Honor. But the problem is it seems to me that if you look at the text in the findings from 87 up to 91, she seems to find that the suggestion that there wasn't any communication of the Vanderbilt contribution to be untenable or troubling, doesn't she? I mean, she says that this is not to say that they didn't make a contribution, and then she finds your position troubling, untenable, difficult to imagine that they didn't make some use of this. I mean, the problem is this is in the context of these other findings where she seems to reject her position. Yeah, and as we stated in our brief, Your Honor, it's our position that those paragraphs, 88 to 91, are based on her failure to consider the argument that we made in our post-trial brief. She said that we failed. That seems to be an argument that we should find that these findings are clearly erroneous. 88 to 91? Paragraphs 88 to 91? That's right. That's correct, Your Honor. Yeah, but suppose we reject that. Suppose we say, well, these findings aren't clearly erroneous. We disagree with you. Then how is it that in the light of those findings, we don't have to send it back to consider this second theory? Because all of the affirmative evidence, all of the direct affirmative evidence that came in at trial from Dr. LeBaudinier and Dr. Dogan was that there was no interest or no knowledge of the Vanderbilt information itself. You can't send back to her to find whether Dogan knew about it when there's already all of the evidence that you would ever need in the case that says, I didn't know about them. I didn't know about their work. I didn't know about their results. She says right at the top of 43, she says, defendant submits that Glaxo made no use of plaintiff's disclosures. Glaxo, Your Honor. Glaxo. And she says a position that this court deems untenable. That's directed to Glaxo, Your Honor. And I think what she's saying there, reasonably we can read what she's saying there, is saying, okay, maybe there was some communication from Vanderbilt through Dr. Ross to Dr. LeBaudinier, but that he didn't actually use that information to conduct the searches that led to the lead compound. So there may have been some form of quote-unquote contribution, but it's in the nature of a prosaic contribution, like contributing what's already in the art. Maybe the inventors or somebody associated with the inventors don't know what's in the art. You contribute that to them. That's a contribution, but a prosaic contribution in the language of Eli Lilly versus Aradine. All of the evidence at trial, and it was unrebutted evidence at trial, showed that Dr. Dogan never heard of Vanderbilt, never heard about their compounds, never heard about their research, never heard about their results. He didn't get instruction from Dr. LeBaudinier in any way about what substituents to test, what compounds to make. There's no evidence in the record that there was any communication, nothing, from Vanderbilt to Dr. Dogan. There's pages and pages, 20-some, 30-some pages of trial transcripts, plus the annual report, plus his lab notebooks, plus the compound data cards, all of which show, it's all unrebutted, that Dr. Dogan did an independent medicinal chemistry project here where he explored all of the various possibilities surrounding a beta-carboline-type compound. There's no need to send it back to Judge Robinson to find out whether there was some use by Dogan of Vanderbilt's information when there's no evidence that that information was ever communicated to him. They can't point to it. Well, their evidence is that the final compound includes some of these features, and they say that is enough to raise a fact issue. So that's evidence, right? Well, below what they were arguing was what Mr. Brennan said here, and he was talking about the timing of what compounds Dr. Dogan made and whether he made the first compound that had an electron-doning substituent on the aromatic ring attached to that C5 position before or after he made others. And Judge Robinson addressed that argument in paragraph 80. The record cites A38 to A39. And at the very end, she talks about what Vanderbilt actually pointed to in support of its assertion that both modifications occurred together. They cited to Dogan's testimony, and she said, wait a minute, all he said was the first thing he did was to explore the replacement of the pyridinyl moiety with other heterocyclic or aromatic moieties. And if you look at the testimony, you'll find that's absolutely the case, and that's backed up by all of the documentary evidence, his laboratory notebooks, compound data cards, and in particular the 1992-1993 annual report, which summarized his work, which showed that he tried every possibility that a medicinal chemist would reasonably look at in replacing what he saw from the lead compound, which was a pyridinyl ring. He tried 2-thionyl, 3-thionyl, furanil. He tried hydrogen, got rid of the ring completely. He did all of these things, and as he testified about, as it was written up at the time contemporaneously in the annual report, and as he and Dr. LeBaudinaire later wrote in the 2003 papers about the discovery of Tadalafil, he looked at all the different possibilities and went with the one that provided the best result at the time. And as he testified, as Dr. LeBaudinaire testified, as Dr. Rafferty testified, as Dr. Padua testified, that's what a medicinal chemist does when you're trying to find a drug compound. You look at all the possibilities. As Dr. LeBaudinaire put it, it's a trial and error, and you go with what you know as a medicinal chemist based on the data you're getting back from the compounds you're synthesizing and getting tested.  And she's already addressed that. In paragraph 80 where she's discussing the various contentions, paragraph 80, fact-finding 80, about whether or not Dr. L. had directed Dr. D. to make this as a result of the knowledge of the Vanderbilt, that connects up then to footnote 50 to the finding of fact. That's correct, Your Honor. So she's already made the finding here. She's made the finding on the first theory. There's no evidence, and at best it's a toss-up, so they lose under either the appropriate standard or the burden of proof or under some lesser standard. And she's already made findings about the second theory. She said there's a lack of evidence. She's already addressed what evidence they did put in. Those are their only two theories for contribution. In order to have co-inventorship, they have to show contribution. It has to be significant. They lose on both theories. Case closed. Well, she did directly address their supposition that Dr. L. had to have directed Dr. D. to do it because they said it happens right away. And the testimony on your side is it didn't happen right away. They searched. I couldn't hear the last part. Their theory is that it has to have been from Vanderbilt because their theory is that Dr. D., it says here, made those changes that were done very quickly. These changes occurred simultaneously. What's the sentence? Plaintiff asserts that these changes occurred simultaneously. What does that mean? In finding a fact 80? Correct, Your Honor. What does she mean when she says when the plaintiff asserted the changes occurred simultaneously? What Mr. Brennan was just arguing, that the first thing that Dr. Delgan did was to make a substitution. And your version of the story was no, that Dr. Delgan did a considerable amount of work. Actually, my version of the story is it doesn't matter whether he did that first or some other slight modification first. When you look at the work that he did in that time frame, he was testing all the different possibilities. And when you look at the actual evidence in the case, which was unrebutted, you saw that he was testing as a medicinal chemist does. That's what I was trying to get at. Now I understand the Vanderbilt theory. The theory, too, is that Dr. D. has to have used Vanderbilt's material because they think he took the substrate and then, bingo, got exactly where they wanted to get for the end product. Right, and all the affirmative evidence has tried. Well, they argue that, but then how do you explain the record evidence that Dr. D. was doing a lot of laboring and hunting around? That's correct. He did all the research and development that actually leads to a drug compound. Their argument would have to be then that his hunting around was a cover-up? To go back to the panel's point before with Mr. Brennan, yes, you'd have to find that both LeBaudinier and Dugan were lying. Remember, LeBaudinier was deposed. Your problem is that to some extent she seems to think they were. There are half a dozen findings here which you don't like and you say are clearly erroneous, but she has made findings that suggest that she didn't believe the testimony that you're relying on. Why shouldn't we send it back to her to reconcile that testimony with those conclusions with the other conclusions? Because Vanderbilt bears the burden by clear and convincing evidence to prove their story. It's not about whether she finds our story compelling or persuasive on the other side. They failed to point to any evidence. As she said, no evidence, lack of evidence to support their story. The best they could get to is an even match. That's not good enough under any standard that this Court would apply. Would you agree that that particular finding is only addressed to one of the two theories? And in large measure, certainly to the second theory as well, that footnote 50 statement combined with what she said in paragraph 80 addresses in large measure, I would think, sufficiently for this Court in looking at all the affirmative evidence that's put in the case that was unrebutted, combining that with what she did find in footnote 50 and in paragraph 80, that's sufficient to put this case to bed. I see my time is up. All right. Thank you, Mr. Brennan. Two minutes. I don't even think I'll be that long, Your Honor. With respect to the question of cover-up, there certainly are questions raised. I didn't really mean that in a pejorative sense. Sure. It just seemed to me that in order for you to sustain your theory on your case on theory number two is that if your theory is, well, Dr. D got from Dr. L to your invention with a snap of the fingers, then why on earth wouldn't the record show a whole lot of effort by Glaxo by Dr. D? Well, two things. We do have the Algoian beta-carboline search story, which had been the published story forever, which was shown not to be true. So whether that's a cover-up, I don't know. The story had been for years from therein that they read the Algoian to Dr. L. I understand that. But, I mean, you're not arguing that Dr. D didn't actually do something physical? He did do something. But the fact, and I don't think that it detracts from our theory, the fact that after he tried ours, which ultimately, regardless of all the stuff he did after the fact, still turned out to be the best thing, the best modifications to make to increase potency, you would expect a pharmaceutical company to say, well, let's see if we can do better. I don't think that that detracts from the probative fact that the very first thing they do is exactly what we teach them to do. You would expect them to continue to look at it and try to find different things. And the fact that they didn't find anything better than this theory that we handed to them points up to the fact of our contribution. The only other point that I'll respond to is I don't believe that the court, district court, made a finding that the judge mentions the evidence on both sides of the issue of how the modifications took place, because to the extent that she did make a finding that the very first step in the SAR process was not the simultaneous substitution of a phenyl ring and an electron donating substituent, that would be clearly erroneous because the evidence shows that that was the very first compound made in the SAR. Thank you. The case is submitted.